## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **GARY L. BRAZLE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:06cv0057** |
| | ) | |
| **MICHAEL J. ASTRUE,**[1] | ) | **Judge Thomas A. Wiseman, Jr.** |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION

Plaintiff Gary L. Brazle filed this civil action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Defendant" or "Commissioner") that Plaintiff was not disabled and denying Plaintiff's claims for Disability Insurance Benefits ("DIB"), as provided under Title II of the Social Security Act ("the Act"), as amended.  Currently pending is Plaintiff's Motion for Judgment on the Administrative Record (Doc. No. 8)  Defendant has filed a Response, arguing that the decision of the Commissioner is supported by substantial evidence and should be affirmed. (Doc. No. 12.)

For the reasons stated below, Plaintiff's motion will be granted, benefits awarded, and the Commissioner's decision reversed.

### I.    INTRODUCTION

Plaintiff filed his application for DIB on February 20, 2002, alleging that he had been disabled since April 1, 2001 due to multiple back impairments and pain, seizures, depression and anxiety.  (*See, e.g.*, Doc. No. 6, Administrative Record (hereafter "AR"), at 105–07, 111–20.)  Plaintiff's application was denied both initially and upon reconsideration.  (AR 87–90, 93–94.)  Plaintiff subsequently requested and received a hearing.  (AR 97, 33–36.)  Plaintiff's hearing was conducted on August 5, 2003 by Administrative Law Judge ("ALJ") Robert L. Erwin.  (AR 37–82.)  Plaintiff, Vocational Expert Kenneth Anchor, and Plaintiff's wife Sandra Brazle appeared and testified at the hearing.

On October 8, 2003, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was

---

[1] Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of the Social Security Administration.  Fed. R. Civ. P. 25(d)(1).

not disabled within the meaning of the Social Security Act and Regulations. (AR 19–28.) On October 31, 2003, Plaintiff filed a timely request for review of the hearing decision. (AR 14.) On May 5, 2006, the Appeals Council issued a letter declining to review the case (AR 8–10), thereby rendering the decision of the ALJ the final decision of the Commissioner. This civil action was thereafter filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). This Court must affirm if it finds that the Commissioner's decision is supported by substantial evidence in the record and that the Commissioner did not commit any legal errors in the process of reaching that decision. *Id.*; *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986).

## II.    REVIEW OF THE RECORD

### A.    Medical Evidence

Plaintiff alleges disability due to multiple back impairments and pain, seizures, and depression and anxiety.

Plaintiff received medical care at the Medical Arts Center from at least as early as November 1997 through September 2001. In November 1997 he was treated for a muscle strain and prescribed moist heat, Tylenol and Flexeril. (AR 209.) In December 1998, Plaintiff was complaining of persistent pain in his lower back and diagnosed with a mid-lower back strain and prescribed Soma, Lorcet Plus, heat and ice. (AR 208.) In January 15, 2001, he reported his back "went out" after he had lifted a piece of equipment into a truck. He was diagnosed with musculoskeletal back pain with no signs of radiculopathy. The physician suggested that Plaintiff see a physical therapist for his back pain but requested that Plaintiff first undergo a CT scan. (AR 207.) A CT scan conducted on January 17, 2001, revealed a "degenerative osteophyte formation at T8-9 and T9-10 on the right with no evidence of acute fracture or spinal canal stenosis or disc herniation." (AR 247.) Plaintiff was prescribed Lortab and referred for physical therapy. (AR 207.) He was again diagnosed with a back strain in February 2001, prescribed Roboxin and Celebrex, and instructed to "wean off" his Lortab. (AR 206.)

On September 9, 2001, Plaintiff arrived in the emergency room at the Cookeville Regional Medical Center after a four-wheeler rolled over him. (AR 487.) X-rays of his back were all negative. (AR 479–86.) He reported that the muscle of his upper back and neck were stiff and tender, and was diagnosed with severe back strain. He was prescribed heat, rest, Methocarbamol and Naproxen. (AR

205.)

From October 2001 at least through May 2003, Plaintiff obtained pain-management treatment from Dr. William H. Leone and other practitioners at The Pain Management Group, P.C., with regular appointments every two to four weeks during that time frame. (AR 248–63, 385–414.) In December 2001, he was diagnosed with thoracic degenerative disc disease and reported his then-current pain index rating to be 7 out of 10. (AR 260.) In January 2002, Plaintiff reported that cold weather had made his pain worse. His Progress Note for March 13, 2002 indicates that, prior to obtaining treatment at the pain clinic, he had been treated with NSAIDs, Lortab, Tylox, Percocet, a TENS unite, physical therapy and spa treatment. Since being at the pain clinic, he had undergone a series of three thoracic epidural steroid injections which provided some relief. (AR 248.) A discogram at T8-9, T9-10 and T10-11 was unremarkable except for a "Grade III tear posterior to the left" at T9-10, with no evidence of disc protrusion (AR 256). An attempted discogram at T3-4 was unsuccessful because Plaintiff's severe thoracic degenerative disc disease and scoliosis made the procedure difficult. (*See* AR 251.) Shortly thereafter, Plaintiff reported that the failed discogram had caused a flare-up of his pain and he had taken more than the prescribed amount of his OxyContin. The Note further indicates that Plaintiff presented with "an erect posture and a steady gait," though he ambulated slowly with a limp and the assistance of a cane. (AR 248.) It also indicated, that he was experiencing "improved function," and that there was "no evidence of side effects, addictive behavior, or evidence of diversion." (AR 248.) In April 2002, Plaintiff underwent another thoracic discography, this time at T3-4, T4-5, and T5-6. His pre- and post-procedural diagnosis was thoracic degenerative disc disease. (AR 386.)

Concurrently with his ongoing treatment at the pain clinic, Plaintiff began seeing neurologist Dr. David McCord at the Tennessee Spine Center. He first went for a surgical consultation in May 2002. At that time, he reported pain resulting from an automobile accident three years ago and a four-wheeler accident in 2001. He stated the pain was located in the mid-back, left arm, left leg, and between his shoulder blades, and described it as a constant but ranging from burning to numbness, stabbing, aching, and pins and needles, with increased pain at night and left leg and arm weakness. Because his symptomology was worsening rather than improving, he was ready for surgical intervention. (AR 299.) Based on Plaintiff's "history, examination and multiple radiographical studies," Dr. McCord diagnosed "an

internally deranged and disrupted disc with vertical instability, spondylosis, and stenosis at T4-5." (AR 300.) On June 17, 2002, Dr. McCord performed a "thorascopic exposure for T4-5 discectomy." (AR 322–23.) Plaintiff's preoperative and postoperative diagnoses were the same: "internally deranged and disrupted disc with lateral stenosis T4-5." (AR 322.)

Plaintiff appeared to be progressing "very well" at a post-operative check up on July 25, 2002. Dr. McCord recommended that Plaintiff increase his range of motion exercises and continue his walking exercises, which would increase his flexibility and muscular strength, and that he continue his pain management regime, which included Celexa, OxyContin, Percocet, and Neurontin (as well as Ambien and Xanax prescribed by his PCP). (AR 343.)

In November 2002, Plaintiff reported increased pain in the thoracic and lumbar regions following a fall (AR 342 (McCord treatment note), 389–90 (Pain Management treatment note)), but a subsequent MRI was unremarkable. (AR 341.) However, his Pain Management treatment note for December 11, 2002 states "[b]ack doesn't seem to be healing. Worst pain between shoulders but also midback pain." (AR 390.) The note for January 3, 2003 again indicates "P[atien]t told thoracic fusion not healing well by Dr. McCord." (AR 391.)

In January 2003, Dr. McCord performed a thoracic discography at T4-5, T5-6 and T6-7, and a left neural foraminal blockade at T4-5 and T5-6. The preoperative and postoperative diagnoses were identical to Dr. McCord's prior diagnoses: thoracic disc derangement, vertical instability, and lateral stenosis. (AR 337.) At the end of January, Plaintiff reported to the Pain Management clinic continuous upper back pain with radiation. (AR 392.) In February 2003, another discography revealed a posterior tear to the annulus of the disc at L5-S1. (AR 406, 414.)

In March 2003, Plaintiff reported to Dr. McCord that his lumbar pain had continued to worsen and his quality of life had "completely deteriorated." (AR 330.)

A month later, Plaintiff underwent an anterior lumbar fusion with autograft at L5-S1, anterior decompression foraminotomy and corpectomy at L5-S1, anterior instrumentation with placement of screws at L5-S1, anterior application of a "cage" at L5-S1, right iliac crest bone graft, separate skin incision, with spinal cord monitoring and reduction, performed by Dr. McCord. (AR 349–50.)

On June 9, 2003, Plaintiff had a consultation with Dr. Thuy T. Ngo at Cookeville Regional Medical

Center for a consultation after Plaintiff had gone to the emergency room with a "sudden onset of unresponsiveness." (AR 382.) Dr. Ngo's consultation note describes Plaintiff as appearing "stuporous" and unresponsive on examination and indicates he suspected complications relating to Plaintiff's medications. (AR 383.) Dr. Ngo's impressions included acute encephalopathy associated with subclinical status epilepticus. (AR 383–84.)

At a follow-up examination in July 2003, Plaintiff and his wife reported that he had "changed dramatically" since the seizure. (AR 381.) His wife stated he was extremely forgetful, got lost in his own house, misplaced items, constantly forgot where he was going, could no longer drive, behaved bizarrely, dropped things, had occasional massive body jerks, and other problems. Dr. Ngo believed that a "large part" of Plaintiff's encephalopathy was medication-related. (AR 381.) In a letter to Dr. Ngo dated July 8, 2003, Plaintiff's primary care physician, Dr. Clough, asked whether the seizure could have resulted from Plaintiff's withdrawal from medications, specifically Percocet and Lorazepam, as a result of having had gastrointestinal distress for several days prior to his hospitalization. (AR 369.) This question does not appear to be answered in the record. Treatment notes from the pain clinic indicate his pain was not greatly diminished following his second surgery. (*See, e.g.*, AR 409.)

Also in the record are treatment notes from mental health practitioner, Dr. Stephen Moore, D.O. Plaintiff appears to have sought treatment with Dr. Moore from April 2002 through at least the summer of 2003. In his treatment notes, Dr. Moore indicates major depressive disorder ("MDD"), chronic pain, anxiety and economic stress as a result of not being able to work. Dr. Moore prescribed Xanax, Celexa, Remeron and Ambien. Plaintiff returned the Remeron saying it was too sedating. (AR 276–79, 367, 418, 419.)

B. Agency Consultant Examinations, Medical Records Reviews and Medical Source Statements

On March 16, 2002, Tennessee Disability Determination Services ("DDS") evaluator, Dr. Linda Blazina, Ph.D., conducted a clinical interview, mental status examination and assessment of intellectual functioning of Plaintiff in conjunction with his disability application. (AR 264–69.) Dr. Blazina reported that Plaintiff's attention and concentration skills were impaired and she opined that the level of Plaintiff's impairment was related to his degree of pain. (AR 265.) Dr. Blazina further reported that Plaintiff appeared to be experiencing symptoms that would be consistent with an adjustment disorder with mixed

anxiety and depressed mood. (AR 268.) With regard to his activities of daily living, Plaintiff reported that he could manage money, drive, dress, and bathe himself, but that he could not cook or do other household chores. (AR 266.) He also reported that for the past year pain had prevented him from engaging in activities he had previously enjoyed such as car racing, scuba diving and water skiing. (AR 266.) Plaintiff further reported that he occasionally attended church, visited with friends and family, spoke to friends on the telephone and sometimes went shopping with his wife. (AR 266–67.) Regarding his ability to do work-related activities, Dr. Blazina noted that Plaintiff's ability to understand and remember appeared to be limited due to his anxiety, dysphoria, and what appeared to be severe pain during the evaluation. Dr. Blazina also noted that Plaintiff's ability to sustain concentration and persistence was "quite limited," but his adaptation abilities were reported as only "limited to a mild degree." (AR 269.) Finally, Dr. Blazina noted that Plaintiff's social-interaction abilities did not appear to be significantly limited. (AR 269.)

On March 24, 2002, Dr. Donita Keown completed a medical examination and assessment of Plaintiff's physical capabilities at the request of the DDS. At that point, Plaintiff had not yet undergone any surgical intervention. Dr. Keown also noted, erroneously, that Plaintiff "was to start treatment with a pain management group, but wrecked a four-wheeler and could not complete treatment." (AR 271.) (By that date, Plaintiff had actually been obtaining regular treatment at the pain clinic since October 2001, as indicated above.) Dr. Keown's physical examination revealed "minimal curvature in the thoracic spine." (AR 272.) Otherwise, she found few remarkable objective signs and believed Plaintiff was dramatizing and magnifying his symptoms. She opined that Plaintiff could sit, stand, or walk at least 6 hours in an 8-hour day, during which time he could routinely lift 20 pounds, and episodically lift 40 pounds. (AR 272–73.)

On April 3, 2002, a DDS psychologist, Dr. Victor O'.Bryan, completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment ("RFC") form regarding Plaintiff. (AR 290–94, 295–97.) In the Psychiatric Review Technique form, Dr. O'Bryan diagnosed Plaintiff with an affective disorder involving a disturbance of mood, accompanied by full or partial manic or depressive syndrome. (AR 290–91.) He also noted mild limitations in Plaintiff's activities of daily living and moderate limitations in both social functioning and maintaining concentration, persistence, or pace. (AR 292.) In

the RFC, Dr. O'Bryan noted moderate limitations in Plaintiff's abilities to maintain attention and concentration for extended periods, to complete a normal workday and workweek, to interact appropriately with the general public, and to get along with coworkers or peers. (AR 295–96.)

On May 24, 2002, DDS physician Dr. James N. Moore completed a Physical RFC based upon a review of Plaintiff's medical records, in which he opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and was unlimited in his ability to push and/or pull. (AR 312–19.) Dr. Moore also opined that Plaintiff was limited to "frequent" climbing, balancing, stooping, kneeling, crouching and crawling due to pain, but that Plaintiff experienced no visual, manipulative, communicative, or environmental limitations. (AR 315–16.)

On August 26, 2002, DDS psychologist, Dr. George Livingston, completed a Psychiatric Review Technique form and Mental RFC regarding Plaintiff. In the Psychiatric Review Technique form, Dr. Livingston indicated moderate limitations in Plaintiff's activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (AR 280–84.) In the Mental RFC, Dr. Livingston found moderate limitations in Plaintiff's abilities to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek, to interact appropriately with the general public, and to respond appropriately to changes in the work setting. (AR 286–87.) Dr. Livingston's handwritten notes referencing parts of the record that support them are completely illegible. (AR 288.)

On October 31, 2002, Dr. K. Shannon Tilley, DDS consultant, completed a Physical RFC regarding Plaintiff, indicating that Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk about 6 hours in an 8-hour workday, and was unlimited in his ability to push and/or pull. (AR 306–11.) Dr. Tilley also opined that Plaintiff was limited to "frequent" postural activities such as climbing, balancing, stooping, kneeling, crouching and crawling but did not have any visual, manipulative, communicative, or environmental limitations. (AR 308–10.) In support of his or her assessment, Dr. Tilley referenced Plaintiff's history of several traumas causing back injuries but believed that he had no "allowable impairment" between the alleged onset date of April 2001 and his first back surgery in June 2002, as indicated in Dr. Keown's assessment. (AR 308–08.) Dr. Tilley also noted

that Plaintiff had only recently (approximately four months previously) undergone back surgery. Dr. Tilley's opinion regarding Plaintiff's functional abilities was based on his assumption that Plaintiff's condition would continue to improve over the course of the year following his surgery and that, eight months into the future, he could be expected to have regained much of his functioning. (AR 307–08.)

On April 18, 2003, Dr. Stephen T. Moore, D.O., completed a Medical Assessment of Ability to do Work Related Activities (Mental) form regarding Plaintiff, in which he opined that Plaintiff had "fair" abilities to use his judgment and to function independently, but that due to chronic pain and the pain medications needed to alleviate the pain, Plaintiff had poor or no ability to follow rules, relate to co-workers, deal with the public, interact with supervisors, deal with stresses, and maintain attention. (AR 415.) Dr. Moore noted that Plaintiff had a "fair" ability to maintain personal appearance and behave in an emotionally stable manner, but poor or no ability to understand, remember and carry out complex, detailed and simple job instructions. (AR 416.) Dr. Moore further commented that it was "hard to see how this man could handle any type of job" given that his energy level, concentration and memory are all impaired as a result of pain and the medications. (AR 416.)

On July 16, 2003, at Dr. McCord's request (AR 371), Physical Therapist Todd Burks at the Cookeville Regional Medical Center performed a Functional Capacity Evaluation ("FCE"). (AR 372–76.) Mr. Burks summarized the FCE results as indicating Plaintiff could perform sedentary work based on the Dictionary of Occupational Titles ("D.O.T.") classifications,. (AR 371.) He also completed a Medical Source Statement of Ability to do Work Related Activities (Physical) form regarding Plaintiff, in which he opined that Plaintiff could lift and/or carry less than 10 pounds on an occasional basis, could frequently lift and/or carry less than 10 pounds, stand and/or walk less than 2 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday (he did not indicate that sitting was affected by Plaintiff's impairments), and was limited in both his upper and lower extremities in his ability to push and/or pull. (AR 377–78.) Mr. Burks further opined that Plaintiff could never climb, balance, kneel, crouch, or crawl, and would require 1 to 2 unscheduled breaks per hour. (AR 378.) Mr. Burks also indicated that Plaintiff suffered from some manipulative and environmental limitations, most notably with regard to exposure to extreme heat or cold, vibrations, and hazards such as machinery and heights. (AR 379.) In support of his assessment, Mr. Burks referenced Plaintiff's "multiple spine fusion surger[ies]" and resulting chronic and severe pain

aggravated by reaching, vibration, bending and twisting.

On August 3, 2003, Dr. McCord, Plaintiff's orthopedic surgeon, completed a Medical Source Statement of Ability to do Work Related Activities (Physical) form regarding Plaintiff, in which he opined that Plaintiff could occasionally lift and/or carry less than 10 pounds, frequently lift and/or carry less than 10 pounds, stand and/or walk less than 2 hours in an 8-hour workday, and was limited in his ability to push and/or pull in both upper and lower extremities. (AR 427–28.) Dr. McCord also opined that Plaintiff would require unscheduled 10 minute breaks every hour, that Plaintiff's pain would frequently interfere with his attention and concentration, that Plaintiff was likely to be absent from work more than 4 times per month because of his impairments, and that Plaintiff could never climb, balance, kneel, crouch, or crawl. (AR 428.) Finally, Dr. McCord noted Plaintiff's need to avoid vibration "at all costs," as it would "definitely aggravate back pain and could affect fusion healing." (AR 429.)

### C.    The Hearing before the ALJ

#### *(1)    Plaintiff's Testimony*

Plaintiff was born on March 18, 1961 and has an eighth grade education. (AR 43, 46.) Plaintiff testified that he had tried to get his GED but had been unsuccessful because of his troubles with math, reading, English, and spelling. His reading and writing skills are reportedly so poor that he is unable to read a newspaper, can "sometimes" follow street signs, and can write a note for his wife that she could read but that others would not be able to read. Plaintiff reported that he had received "specialized vocational training" in mechanics. (AR 46–47.)

 Plaintiff further testified that, at the time of the hearing, he had been married for approximately six years and that he lives with his wife and three children. (AR 43–44.) Plaintiff testified that his wife does not work outside of the home because "she has to help [him] daily." (AR 44.)

Plaintiff testified that he had last worked in "about 2001" with Eaton Equipment. Plaintiff reported that he had worked as a machinist at Eaton for approximately 19 years. (AR 48.) Plaintiff testified that he had been a team leader at one time and that his job had included "see[ing] that people got their work done." (AR 75.) He had done "scheduling" as a team leader but not much paperwork. (AR 75.)

Plaintiff testified that he had been in an accident in 2001 while car racing. The car engine exploded, causing him to spin "around and hit the wall" and injure his back. (AR 49.) Plaintiff also

testified that he was later involved in an accident on a "four-wheeler." (AR 49–50.) Plaintiff stated that he left his job at Eaton because of his back injuries. (AR 50.) Plaintiff stated: "I just worked until I couldn't work no more. I couldn't hardly even stand up." (AR 51.)

Plaintiff reported having a seizure "two or three weeks" prior to the hearing and testified that he still had problems with seizures as of the hearing date. (AR 50–51.) Plaintiff testified that, at the time of the hearing, he was having seizures "once, twice, every other day, sometimes twice a day," despite the fact that he was taking medications to control them. (AR 51–52.) Plaintiff reported that the seizures do not last very long and were "very light." (AR 52. )

Plaintiff testified that he uses a Duragesic patch and Percocet to help with his back pain. He had gone to physical therapy "once or twice" following his first surgery in 2001, but that "they thought [his] back was too bad to put [him] in therapy." (AR 53.)

Plaintiff testified that before he began to have seizures, he would get up around 9:00 a.m., but that he did not sleep very well throughout the night because of his back pain. Plaintiff reported that formerly had hobbies including riding four-wheelers, skiing, scuba diving and racing, but no longer engages in any of these activities. (AR 54.) Plaintiff stated that before he began having seizures, he had done "a little bit" of the grocery shopping and housework, "but not much." (AR 54.) Plaintiff reported that his wife does all the cooking and laundry and that his son takes care of the lawn. (AR 55, 56.)

Plaintiff further testified that he does not have any friends or relatives he regularly visits or who regularly visit him, because he is "not very active" anymore. (AR 55.) Plaintiff reported that he occasionally attends church but had not gone in the past three months.. He also reported that his appetite is "not too good" and that he does not regularly exercise but "tr[ies] to walk a little bit."[2] (AR 55.) Plaintiff stated that, on average, he walks approximately "half a mile a week." (AR 55.) He also testified that he still has a valid, unrestricted driver's license but is able to drive no more than once or twice a week and then only for short distances. (AR 45-46.)

Plaintiff testified that he sometimes has trouble getting dressed, particularly putting on his shoes, and that he spends his days "mostly watching TV." (AR 57.) Plaintiff reported that he has problems

---

[2] Plaintiff estimated that he walked as much as a half mile a week, based on the fact that his mother lives about an eighth of a mile away from his house and he visits her "sometimes," apparently up to twice a week. (AR 55–56.)

sitting for any length of time, but that he has more trouble with standing than anything else because of the pain in his upper back. (AR 58.) Plaintiff stated he could lift "nothing" and that his doctors had placed him "on a two pound restriction," which he had been on for "a pretty good while." (AR 58.)

Plaintiff stated that his lower back hurts a little worse than his upper back, and described the pain as feeling "like a knife sticking [him]." (AR 58.) He described the pain as more or less constant, and so severe it sometimes made him cry. (AR 59.) He rated his pain during the hearing itself at approximately six or seven out of ten. (AR 60–61.)

Plaintiff reported that he has to lie down a lot periodically during the day, and that on some days he did not leave his bedroom at all. On at least one occasion, he had spent three days in his room without getting up. (AR 64.)

Plaintiff testified that Dr. McCord performed all of his surgeries and had recommended to him two more surgeries, but that his back needed to heal further before he underwent any more procedures. (AR 59.)

Plaintiff also testified that he had been seeing Dr. Stephen Moore for his "nerves." (AR 61.) Plaintiff stated that he had started getting "nervous and crying about everything, just depressed." (AR 61.) Plaintiff reported that he has "some, but not that much" difficulty controlling his temper. (AR 62.) Plaintiff also reported that his energy level had changed because he "can't do nothing" and "if [he] does something, it hurts [his] back worse so it just makes things worse." (AR 62.) Plaintiff added that he would "love to be able to do things," but the most he could do with his back pain was ride a bicycle to his mother's house, which he did not do often. (AR 62.)

Plaintiff reported that he had difficulty focusing on his surroundings and that things got "cloudy, very cloudy." (AR 62.) Plaintiff also testified that he experienced this cloudiness when he was driving. When asked whether he experienced these types of difficulties before his last surgery and the seizures, Plaintiff testified that he "can't really say." (AR 63.)

Plaintiff further testified that he has difficulty sleeping and that when he does sleep, he experiences nightmares, which had become worse since he started having seizures. (AR 63.)

Plaintiff reported that he has been using a cane for at least a year, at Dr. McCord's recommendation, to stabilize him when he walks. (AR 64.)

Plaintiff testified that before he had his last surgery, he experienced side effects from his medication, particularly from the OxyContin, which he did not like because it was "too potent." (AR 64.)

### (2)    Testimony of Sandy Brazle, Plaintiff's Wife

Plaintiff's wife, Sandy Brazle, also testified on behalf of Plaintiff at the hearing. She stated she and Plaintiff have been married for almost seven years. (AR 66.) According to Plaintiff's wife, Plaintiff had injured his back in an accident in the spring of 2001 while he was racing cars, and that he was in second accident in which a four-wheeler rolled over him. Both of these accidents occurred prior to Plaintiff's thoracic surgery, but she recalled that Plaintiff had another accident on the "little four wheeler" after the thoracic surgery and before November 2002. (AR 70–72.)

Describing Plaintiff's condition at the time of his first surgery, Plaintiff's wife testified that Plaintiff's thoracic area "created a lot of breathing problems," "strained," "pulled," "twist[ed]," and made "moving his arms [ ] very painful." (AR 66.) Plaintiff's wife further stated that "[t]he expressions on his face when he would lift his arms up or if he would turn sideways, . . . the tears in his face and the fact that he couldn't breathe for a little while" let her know when Plaintiff was in pain. (AR 66.) Plaintiff's wife stated that, as of the time of the hearing, Plaintiff still had difficulties with his thoracic area, including difficulty "twisting and bending." (AR 67.) She first started noticing Plaintiff's lower back problems after his surgery on his mid-thoracic region. (AR 67.)

Plaintiff's wife also testified that after the first surgery, Plaintiff's activities around the house changed completely, such that she had to do everything around the house and yard. (AR 67.)

Plaintiff's wife reiterated Plaintiff's testimony that he began seeing Dr. Stephen Moore in 2002. (AR 68.) Plaintiff's wife stated that Plaintiff had been having a "very, very hard time" adjusting to his restricted lifestyle in which he could no longer work or do any of his old extracurricular activities. She stated that Plaintiff has crying spells "quite frequently," depending on "if he's having a good day or a bad day." (AR 68–69.) Plaintiff's wife further testified that Plaintiff has difficulty controlling his symptoms, and "he gets made at himself a lot" because "he can't understand why his body will not do what his mind wants it to do." (AR 69.)

### (3)    Testimony of Vocational Expert Kenneth Anchor, Ph.D.

Vocational Expert ("VE") Dr. Kenneth Anchor also testified at Plaintiff's hearing. With regard to

Plaintiff's past relevant work history, the VE stated that Plaintiff's job as a "machinist" was his only vocationally relevant job. The VE classified it as a skilled-level and exertionally "heavy" job. The VE further testified that the job required specific, nontransferable skills. (AR 76.)

The ALJ presented the VE with a hypothetical situation involving a claimant who, like the Plaintiff, was a younger individual with a limited education and no transferable skills, and was limited to light work involving lifting no more than 20 pounds; who could only occasionally engage in postural activities such as climbing, stooping, bending, crouching, crawling, kneeling, and balancing; who could not engage in repetitive reaching or frequent heavy gripping and would need the option to sit or stand as needed for comfort; and who had the same moderate restrictions in the psychological and emotional areas as described in the previous hypothetical. (AR 78.) The VE testified that such a claimant could perform jobs at the light level, including those of inventory clerk, supply attendant, storage attendant, machine tender and quality-control clerk. According to the VE, there were more than 23,000 of these jobs in Tennessee, and more than 1.2 million nationally. (AR 78–79.) The ALJ questioned whether the hypothetical claimant's level of literacy would limit his ability to do the quality-control clerk position. The VE responded that the hypothetical claimant's level of literacy would not affect his ability to do the job because the quality-control clerk position was "basically [ ] an inspector type job where the individual is actually looking at whatever the product is." (AR 78.)

The ALJ then presented the VE with a hypothetical situation in which an individual of the same age, experience and education was limited to sedentary work that involved lifting no more than 10 pounds and who was also unable to climb, stoop, crouch, crawl, kneel or balance, and unable to tolerate temperature extremes, vibrations, or moving machinery. The hypothetical claimant would also be restricted to no more than occasional bending, reaching, and fine manipulations, and because of pain and attendant depression would be moderately restricted in the ability to relate to co-workers, deal with the public, deal with work stresses, maintain attention and concentration, and demonstrate reliability. The hypothetical claimant would need a sit/stand option as well. (AR 79.) The VE opined that in the State of Tennessee, there were more than 6,000 jobs at the sedentary level this hypothetical claimant could perform, including those of surveillance monitor, component cleaner, labeling clerk, pricing clerk and electronics tester. The VE further opined that nationwide, there were more than 400,000 jobs available to

such a claimant.  (AR 80.)

The ALJ then modified the last hypothetical to include "the fact that the claimant would need one or two unscheduled breaks . . . per hour throughout the work day."  (AR 80.)

The VE opined that one break per hour would not be a problem, but two breaks per hour would be "unacceptable in a conventional work setting" and would eliminate all the job possibilities.  (AR 80.)

The ALJ then modified the hypothetical to "marked limitations" in the areas "previously described . . . as being moderate limitations."  (AR 80.)  The ALJ asked the VE how that change would affect any of the VE's testimony in the first three hypotheticals.  The VE opined that "with marked deficiencies in all of those areas, that would eliminate or preclude all full-time gainful activity."  (AR 81.)

III.     THE ALJ'S DECISION

In his written Decision, the ALJ made the following specific findings of fact:

1.      The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.      The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.      The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(b).

4.      These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.      The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

7.      The claimant has the following residual functional capacity:  lift/carry 10 pounds on a frequent basis and 20 pounds on an occasional basis; sit/stand as needed for comfort.  He is precluded from more than occasional climbing, stooping, bending, crouching, crawling, kneeling, and balancing; from any jobs requiring repetitive reaching with either arm or heavy gripping with either hand.  Due to mental difficulties, the claimant is moderately limited in his ability to relate to coworkers; deal with the public; deal with work stresses; maintain attention and concentration; and to demonstrate reliability.  These residual functional capacity limitations are commensurate with a modified range of light work.

8.      The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

9.      The claimant is a "younger individual" (CFR § 404.1563).

10.     The claimant has "a limited education" (CFR § 404.1564).

11.     The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR § 404.1568).

12.     The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

13.     Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.18 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as inventory clerk, supply attendant, storage attendant, machine tender, and quality control clerk. At the entry level of light work there are 1.2 million jobs in the national economy and 6000 in the region.[3]

14.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)).

(AR 27–28.)

In reaching these findings, the ALJ decided that Plaintiff's purported ability to engage in "such a variety of daily activities tends to negate the credibility of his subjective complaints." Specifically, the ALJ found that the record indicated Plaintiff is able to care for his personal needs, drive a car, attend church, visit with friends and family, talk to friends on the phone, shop with his wife, walk or ride his bicycle short distances on occasions when the pain is less severe, and manage his own finances. The ALJ noted: "One would not reasonably anticipate that a person who experiences substantial drowsiness from medications, the degree of pain alleged, or severe depression, to be able to tolerate the physical demands, the level of concentration, or the amount of social interaction, necessary to perform many of these activities." (AR 24.)

Without much further analysis, the ALJ found that Plaintiff was capable of lifting 20 pounds occasionally and 10 pounds frequently, would need the option to move from sitting to standing at will, and was precluded from more than occasionally climbing, stooping, bending, crouching, crawling, kneeling or balancing, and from any jobs requiring repetitive reaching with either arm or heavy gripping with either hand. The ALJ also found Plaintiff to be moderately limited in his ability to relate to coworkers, deal with the public, deal with work stresses, maintain attention and concentration, and demonstrate reliability. The

---

[3] The VE actually testified that there were more than 23,000 of these particular jobs statewide. (AR 79.) In response to a different hypothetical involving a claimant limited to sedentary work and other limitations, the VE testified that there were 6,000 jobs statewide that such a claimant could perform. (AR 79–80.)

ALJ indicated these limitations would permit Plaintiff to perform a limited range of light work.  (AR 24.)

In support of these findings, the ALJ further stated as follows:

> [These] physical capacity limitations are consistent with the medical source statement of Dr. Keown and are more than reasonable given the fact that the State Agency physician [Dr. Tilley] only limited the claimant to medium work. . . .  While physical therapist Burke [sic] limited the claimant to sedentary work, he noted that the claimant only put forth fair effort. . . .  Likewise, while Dr. McCord limited the claimant to sedentary work, he also observed that the claimant was currently recovering from back surgery but he failed to indicate if the claimant would actually be disabled for a period of 12 months. . . .  The claimant's mental capacity limitations are congruent with the medical source statement of the State Agency psychologist who reviewed much of the medical evidence of record [Dr. O'Bryan].  While psychiatrist Dr. Moore opined that the claimant had no ability to maintain concentration or follow even simple instructions, the undersigned finds such assertions to be totally unbelievable as the psychiatrist averred that the claimant was able to manage his own benefits . . . .

(AR 24–25.)

The ALJ then referenced the VE's testimony to reach the determination that there was a significant number of jobs in the national economy that the Plaintiff could perform.  (AR 26.)

## IV.    LEGAL ANALYSIS

### A.    Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.  *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion."  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  *Bell v. Comm'r of Soc. Sec.,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consol. Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  In fact, even if the evidence could also support a different conclusion, the

decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985) (citations omitted).

       **B.**        **Proceedings at the Administrative Level**

       The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" includes previous work performed by the claimant, as well as any other relevant work that exists in the national economy in significant numbers, regardless of whether such work exists in the immediate area in which the lives, whether a specific job vacancy exists, or whether the claimant would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

       The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g.*, *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the claimant, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the claimant must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Heston*, 245 F.3d at 534 (citing *Abbott*, 905 F.2d at 923; 20 C.F.R. §§ 404.1520(b) and 416.920(b)). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)(2000)). Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled. *Heston*, 245 F3d at 534.

       Once the claimant establishes a *prima facie* case that he is unable to perform his prior relevant

employment, the burden shifts at step five to the Commissioner to show that the claimant can perform other substantial gainful employment, and that such employment exists in the national economy.  *See, e.g.*, *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.  Otherwise, the grid cannot be used to direct a conclusion but only as a guide to the disability determination.  20 C.F.R. §§ 404.1520, 416.920.  In cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner may rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining a claimant's residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and nonsevere.  42 U.S.C. § 423(d)(2)(B).

### C.    Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred in:

(1) failing to find Plaintiff disabled under Listing 1.04;

(2) rejecting the opinions of Plaintiff's treating orthopedic surgeon and treating psychiatrist; and

(3) dismissing Plaintiff's subjective complaints of pain as lacking credibility.

(*See* Doc. No. 9, at 9.)  Plaintiff maintains that, on the basis of these errors and pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed or remanded.

As set forth below, the Court finds that the ALJ erred in failing specifically to consider whether Plaintiff meets or equals Listing 1.04.  That error alone would require remand, but the Court further finds that reversal and an award of benefits is warranted, as the ALJ's decisions regarding Plaintiff's functional capacity and the degree of pain suffered are not supported by substantial evidence in the record, and the ALJ clearly applied the wrong legal standard when he rejected the opinions of Plaintiff's treating medical

sources in order to reach a conclusion that Plaintiff is not disabled.

### (1)    Listing 1.04

Listing 1.04 applies to "Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord."  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In conjunction with such a disorder of the spine, a claimant must present:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis . . . ;
>
> or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Id.

The ALJ did not specifically address the application of Listing 1.04.  Rather, he simply found that while Plaintiff has "severe" impairments, they are "not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4."  (AR 21.)  Plaintiff argues that this finding is not supported by substantial evidence.

Although there is no evidence of spinal arachnoiditis and little evidence that Plaintiff is unable to "ambulate effectively,"[4] there is no dispute that Plaintiff has been diagnosed with degenerative disc

---

[4] The Administration has defined what it means by "inability to ambulate effectively" as follows:

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a

disease, osteoarthritis at multiple disc levels, and spinal stenosis. The issue then is whether there is sufficient "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. § 404, Subpt. P, App. 1, Listing 1.04A.

Specifically referring to Dr. Keown's examination results, the ALJ found that the medical record reflects that Plaintiff has "full range of motion of his shoulders, elbows, wrists, hands, hips, knees, and ankles," "no evidence of spasm or straight leg raise signs," and had "intact" motor strength. (AR 22.) As Plaintiff points out, however, Dr. McCord's examination on May 9, 2002, just prior to his June 2002 surgery, showed limited range of motion of the cervical spine; 4/5 weakness in the left deltoid, left bicep, and bilateral interossei numbness in the left arm affecting all the fingers of the left hand, and pain occasionally radiating from the mid-scapular region to the front of Plaintiff's chest. (AR 304.) Dr. McCord also noted hyperactivity of the reflexes at the biceps, brachioradialis, triceps, knee and ankle. In response, the Commissioner points out that at Plaintiff's surgical follow-up examination in July 2002, while Plaintiff was still recovering from his surgery, Dr. McCord found good range of motion and muscle strength in both upper and lower extremities bilaterally, intact sensation to light touch and normal reflexes. (Doc. No. 12, at 7 (referencing AR 343).) The Commissioner also argues that subsequent clinical findings fail to demonstrate nerve root or spinal cord compression. (*Id.*)

Notwithstanding, both the ALJ and the Commissioner have failed to recognize that Plaintiff's condition obviously continued to deteriorate over the course of the year following his first surgery. Plaintiff reported a fall sometime in the autumn of 2002. In January 2003, Dr. McCord performed a left neural foraminal blockade at T4-5 and T5-6. On that date, he diagnosed thoracic disk derangement, vertical instability, and lateral stenosis. (AR 337.) As of March 2003, Plaintiff reported to Dr. McCord that he had been in significant pain over the last several years and was by then "worse and not better." (AR 330.)

---

reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1.

While he was still experiencing continuing problems with his thoracic spine, problems with his lumbar spine were even more acute. Dr. McCord diagnosed internally deranged and disrupted disc, vertical instability, lateral stenosis and hypolordosis at L5-S1. (AR 330.) A pre-surgical physical exam in April 2003 revealed

> limited and painful range of motion with lumbar flexion, extension, lateral bending bilaterally and rotation. Motor exam, deficits noted the lumbar dermatomes, particularly in the legs, left greater than right. Sensory exam, paraesthesia noted in the low back which radiated into the hips and legs bilaterally, left greater than right. Reflexes are 3+ of the knees bilaterally.

(AR 350.)

In other words, it seems fairly apparent that Plaintiff has met the requirements of Listing 1.04A at least since the date of his first surgery in June 2002. Lateral stenosis by definition involves a bone spur (osteophyte) that has already developed from a degenerating disc and presses on a nerve root. http://www.spine-health.com/Conditions/Spinal-Stenosis/Spinal-Stenosis-Symptoms-Diagnosis-And-Treatment/Lumbar-Spinal-Stenosis.html. The symptoms described by Dr. McCord are certainly consistent with nerve involvement regardless of whether Dr. McCord actually used the term "nerve root compression." At a minimum, the ALJ erred in failing to consider more closely whether Plaintiff meets or equals Listing 1.04A. The evidence that he does is fairly compelling and, as discussed below, the countervailing evidence is insubstantial.

### (2) The Weight Accorded the Opinions of Plaintiff's Treating Sources

Plaintiff argues that the ALJ improperly rejected the opinions of Dr. David McCord, Plaintiff's orthopedic surgeon, and Dr. Stephen Moore, Plaintiff's psychiatrist.

With regard to the evaluation of medical evidence, the Code of Federal Regulations states:

> Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
>
> (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative

examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. . . .

    (3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. . . .

    (4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

    (5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist. . . .

20 C.F.R. § 416.927(d). *See also* 20 C.F.R. § 404.1527(d).

If the ALJ rejects the opinion of a treating source, he is required to articulate some basis for doing so. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). The Code of Federal Regulations defines a "treating source" as "your own physician, psychologist, or other acceptable medical source who provides you or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502.

    *(a)    The ALJ's Rejection of Dr. McCord's Opinion*

In rejecting Dr. McCord's opinion, the ALJ simply stated his conclusion that the limitations ascribed by Dr. Keown in her medical source statement were "more than reasonable," and noted that Dr. McCord's opinion as to Plaintiff's limitations was given at a time when Plaintiff was recovering from (yet another) spinal surgery "but he failed to indicate if the claimant would actually be disabled for a period of 12 months." (AR 24–25.) The ALJ gave no further justification for rejecting Dr. McCord's opinion.

Although the ALJ recognized that a treating physician's opinion must be given substantial weight unless "good cause is shown to the contrary" (AR 25), the ALJ simply did not present any good reasons for disregarding Dr. McCord's opinion. First, with respect to the ALJ's comment that Dr. McCord did not indicate whether Plaintiff's disabling condition could be expected to last for twelve months, the ALJ ignored the fact that Plaintiff had been reporting severe back pain for well over a year and had not exhibited substantial (if any) improvement since his first surgery in June 2002. Further, the ALJ

completely disregarded the fact that Dr. Keown's assessment predated Dr. McCord's by more than a year and was given prior to either of Plaintiff's two back surgeries. The ALJ found Dr. Keown's assessment to be reasonable based on a comparison with that of the State Agency physician (who "only limited the claimant to medium work"). In doing so, the ALJ failed to recognize that the State Agency physician, in assessing Plaintiff's RFC, was projecting eight months into the future and presuming the Plaintiff would recover successfully from his first surgery by then. (*See* AR 307–11.) In other words, the State Agency physician did not assess Plaintiff's current abilities, which he apparently found to be quite limited. Moreover, despite his optimism as to Plaintiff's prognosis at that point, there is no evidence in the record suggesting that Plaintiff improved as anticipated after his first surgery. Rather, the evidence is undisputed that his condition deteriorated. Under the circumstances, no "reasonable mind" would have accepted Dr. Keown's assessment as relevant or adequate to support the ALJ's conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389 (6th Cir. 1999).

Dr. McCord treated Plaintiff for an extensive period of time; he is a specialist; and his opinions are uncontradicted by any relevant and contemporaneous opinions from any other treating or non-treating physicians. The Court finds that the ALJ erred in failing to accord controlling weight to Dr. McCord's opinion, and his reliance on Dr. Keown's opinion was, under the circumstances, patently unreasonable.

*(b)     The ALJ's Rejection of Dr. Stephen Moore's Opinion*

Plaintiff also argues that the ALJ improperly rejected the findings of Dr. Moore, Plaintiff's treating mental health practitioner. In fact, the only reason the ALJ gave for rejecting Dr. Moore's opinion was that he found it unbelievable that an individual who had no ability to maintain concentration or even follow simple instructions would be capable of managing his own benefits. (AR 25.) The ALJ's opinion in that regard amounts to little more than speculation and is not supported by any actual evidence in the record. The Commissioner also argues in support of the ALJ's decision that Dr. Moore's assessment was contradicted by consultative psychologist Dr. Blazina's. The problem, again, is that Dr. Blazina performed her assessment in the spring of 2002, prior to either of Plaintiff's two back surgeries and the decline in his condition over the course of the year between them that is documented by the medical record. The ALJ erred in failing to give good reason for rejecting Dr. Moore's opinion, which is not contradicted by any contemporaneous or relevant evidence in the record. Adoption of Dr. Moore's opinion would require a

finding of disability.

### (3)    *Plaintiff's Subjective Complaints of Pain*

Finally, Plaintiff contends that the ALJ erred in rejecting his subjective complaints of pain as not totally credible.

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's allegations of pain:

> [S]ubjective allegations of disabling symptoms, including pain, cannot alone support a finding of disability. . . .  [T]here must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

*Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting S. Rep. No. 466, 98th Cong., 2d Sess. 24); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled. . . ."); *Moon v. Sullivan*, 923 F.2d 1175, 1182–83 ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ may distrust a claimant's allegations . . . if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other.").  Moreover, "allegations of pain . . . do not constitute a disability unless the pain is of such a debilitating degree that it prevents an individual from engaging in substantial gainful activity."  *Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988).

In evaluating a claimant's complaints of pain, the ALJ quite properly may consider the claimant's credibility.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir.1981).  In assessing the credibility of a witness, personal observations are important and comprise one of the reasons underlying the preference for live testimony. *See* 2 McCormick on Evidence § 245, at 94 (4th ed.1992); *cf. Ohio v. Roberts*, 448 U.S. 56, 63–64 (1980).  Thus, an ALJ who has observed a witness's demeanor while testifying should generally be afforded deference when his credibility findings are assessed.  *See Jones*, 336 F.3d at 474–75; *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir.1987).  The Court, however, is not obliged to accept an ALJ's assessment of credibility if his finding is not supported by substantial evidence. *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 386–87 (6th Cir. 1978).

In the instant case, the ALJ found that Plaintiff's "ability to perform such a variety of daily activities tends to negate the credibility of his subjective complaints, especially the degree of pain he maintained he

experiences." (AR 24.) Specifically, the ALJ referenced evidence in the record that Plaintiff "cares for personal needs; drives his car; attends church; visits with friends and family; talks to friends on the telephone; and shops with his wife." (AR 24.) The ALJ also noted that Plaintiff testified to walking and riding his bicycle at times when his pain is less severe, and that he reported no difficulty in managing his income. The ALJ then concluded: "One would not reasonably anticipate that a person who experiences substantial drowsiness from medications, the degree of pain alleged, or severe depression, to be able to tolerate the physical demands, the level of concentration, or the amount of social interaction, necessary to perform many of these activities." (AR 24.)

Although an ALJ's findings regarding a claimant's credibility must generally be accorded deference, as indicated above, the Court finds that the ALJ's credibility assessment in this instance is not supported by substantial evidence in the record. First, the objective medical evidence of record provides ample proof of an underlying medical condition of such severity that it could reasonably be expected to give rise to the alleged degree of pain. *Duncan*, 801 F.2d at 853. Moreover, as Plaintiff points out, the ALJ's conclusion regarding credibility is based upon a "mischaracterization of [Plaintiff's] level of activity" (Doc. No. 9, at 13). Plaintiff testified that he infrequently helps with grocery shopping, almost never does housework, no longer works on cars or takes care of the lawn, visits with friends or relatives very infrequently, last attended church (where his brother is the preacher) three months prior to the hearing, and tries to walk "a little bit." (AR 54–55.) His wife does the laundry and the cooking. (AR 56.) He no longer engages in any of his former hobbies and, formerly a car-racing enthusiast, drives his car only once or twice a week, and only for short distances. (AR 46.) Even Dr. Blazina was persuaded in April 2002 that Plaintiff's degree of pain was severe, and the evidence is clear that it only got worse after she performed her evaluation.

More importantly, Plaintiff's acknowledged range of daily activities does not conflict with his alleged degree of pain. *Cf. Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248–49 (6th Cir. 2007) (finding the ALJ erred in rejecting the plaintiff's subjective complaints of pain simply because she was still able to drive, clean her apartment, care for two dogs, do laundry, read, do stretching exercises and watch the news "despite her numerous complaints," and specifically noted that the ALJ mischaracterized the plaintiff's testimony regarding the scope of her daily activities, failed to acknowledge that these daily

activities were not comparable to typical work activities, and did not comment on the fact that the plaintiff received a substantial amount of assistance in her personal care and daily activities from her children who lived nearby).  The ALJ's rejection of Plaintiff's subjective complaints of pain in this case is simply not supported by substantial evidence in the record.

### (4)     The VE's Testimony

Although Plaintiff has not raised problems with the VE's testimony as an issue, the Court further observes that the VE did not verify that his testimony regarding supposedly available jobs was consistent with *The Dictionary of Occupational Titles* ("D.O.T.") and did not provide occupational codes from the D.O.T. for the jobs he did identify.  Accordingly, the Plaintiff did not have any way of verifying whether the VE's testimony was consistent with the D.O.T..  In fact, even if the ALJ had determined that Plaintiff was capable of sedentary work, based on Dr. McCord's assessment, rather than light work, it is not clear that he would have been able to perform the jobs identified by the VE:  There are significant conflicts between the VE's testimony and the D.O.T.'s job descriptions, which the ALJ failed to elucidate.

In particular, the ALJ asked the VE whether there were any jobs in the national economy that could accommodate a claimant restricted to sedentary work; who needed to avoid temperature extremes, vibration, unprotected heights, and moving machinery; who would not have to do any climbing, stooping, crawling or other postural activities and no more than occasional bending or reaching with either arm, occasional fine manipulations; and would need a sit/stand option.  The jobs the VE purported to identify as accommodating those physical restrictions (as well as "moderate" restrictions in the emotional realm) are either not to be found in the D.O.T., or are not identified by the D.O.T. as consistent with these restrictions.

For instance, the job of "surveillance-system monitor" is classified as sedentary work but requires Level 3 reasoning and language skills, including the ability to "[s]peak before an audience with poise, voice control, and confidence, using correct English and a well-modulated voice."  D.O.T. 379.367-010. Plaintiff has an eighth-grade education and minimal reading and writing skills inconsistent with these requirements.

The job "component cleaner" *per se* is not found in the D.O.T.  The jobs of "photo mask cleaner" (D.O.T. 590.684-034) and "wafer cleaner" (D.O.T. 590.685-102), both in the electronic components

industry, are light level jobs, not sedentary, and require "frequent" reaching and handling.

The job "label clerk," also identified by the VE, is not found in the D.O.T. "Pricing clerk" is likewise not listed, but the job of "marker," also known as "price marker" among other alternate titles, is light work that requires frequent reaching, handling, and fingering. D.O.T. 209.587-034. Other types of clerk jobs generally also require frequent reaching and handling, and most require a higher skill level and more advanced cognitive abilities than Plaintiff has. *See, e.g.*, "Checker II," also known as check clerk or data clerk, D.O.T. 209.687-101 (sedentary work but requires Level 3 reasoning, Level 4 vocational preparation, and frequent reaching); pricer (D.O.T. 214.467-014) (similar requirements); laundry-pricing clerk (D.O.T. 216.482-030) (similar); stock clerk (D.O.T. 299.367-014) (heavy work with frequent reaching).

Finally, the job of "electronics tester" (D.O.T. 726.261-018) is classified as medium work requiring Level 7 specific vocational preparation, frequent reaching and testing, and much higher cognitive skills than Plaintiff's education level indicates.

Pursuant to 20 C.F.R. § 404. 1566(d)(1), the agency has taken administrative notice of the D.O.T., thereby obviating any possible argument that the ALJ had no reason to be aware of the existence of a conflict between the VE's testimony and the D.O.T. Moreover, while the ALJ obviously is not required to memorize the D.O.T. nor to consider the D.O.T. as the only source of acceptable information regarding the characteristics and requirements of various jobs in the national economy, the insurmountable fact remains that the ALJ has an affirmative obligation to inquire regarding the existence of possible conflicts and, in the presence of apparent conflicts, to ask the VE to provide a reasonable explanation for them. *Cf. Young v. Comm'r of Soc. Sec.*, 351 F. Supp. 2d 644, 652 (E.D. Mich. 2004) (remanding for further fact-finding where there was an apparent conflict between a VE's testimony and the D.O.T. but the ALJ made "no attempt to comply with SSR 00-4p" by eliciting an explanation for the conflict before relying on the VE's evidence); *Teverbaugh v. Comm'r of Soc. Sec.*, 258 F. Supp. 2d 702, 705–06 (E.D. Mich. 2003) (citing SSR 00-4p, finding that the ALJ failed to carry his burden at step five where the ALJ failed to ask the VE whether the jobs she identified as consistent with the Plaintiff's RFC conflicted with the D.O.T., and the VE failed to provide the codes for the positions she listed, thereby prevent Plaintiff from ascertaining whether there was a conflict). Thus, even if the ALJ had adopted Dr.

McCord's assessment of Plaintiff's functional capacity, the Court would necessarily have found that the Commissioner failed to satisfy his burden at Step Five to prove the existence of jobs in the national economy that Plaintiff could actually perform.

D.    **Evidence of Disability Is Overwhelming.**

Sentence four of § 405(g) provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  "In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking."  *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).  A court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).  *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

In this case, the Court finds that the ALJ's decision was clearly erroneous; proof of disability is very strong, even overwhelming; and evidence to support an alternative conclusion is completely lacking. The Court finds that the evidence in the record clearly demonstrates that Plaintiff has been disabled at least since the date of his first surgery on June 17, 2002, and he is entitled to disability insurance benefits beginning on that date.

V.    **CONCLUSION**

For the reasons discussed above, Plaintiff's Motion for Judgment on the Administrative Record will be granted, benefits awarded, and the decision of the Commissioner reversed.  An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge